MICHAEL BAILEY
United States Attorney
District of Arizona
RYAN J. ELLERSICK
GORDON E. DAVENPORT III
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: ryan.ellersick3@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 18-02068-RM-EJM |
| Plaintiff, | SENTENCING MEMORANDUM |
| vs. | |
| Jose Rosalio Fuentes, | |
| Defendant. | |

## INTRODUCTION

"Criminal conduct by a law enforcement agent that is facilitated by the agent's unique position of public trust is especially serious; imposing severe punishment to deter others and to promote respect for the law is essential. These guiding principles are enhanced when the offending officer is a border agent entrusted not only with law enforcement but also with national security responsibility." *United States v. Garnica*, 471 F. App'x 368, 370 (5th Cir. 2012).

The defendant in this case abused his position as a Customs and Border Protection (CBP) officer to advance the interests of a criminal organization in exchange for large cash bribes. Given the defendant's pattern of flagrant corruption, as outlined in detail below, the Court should impose a substantial term of imprisonment consistent with the Sentencing Guidelines.

**FACTUAL BACKGROUND**

A. <u>Specific Offense Conduct</u>

In early February 2018, the defendant, a canine officer for CBP in Nogales, Arizona, exchanged a series of messages with UP1[1] about smuggling a convicted and deported felon, Juan Carlos Gonzalez-Villa, into the United States from Mexico in exchange for a cash bribe. The discussion began on February 8, 2018, with UP1 asking the defendant what would happen if Gonzalez-Villa, who was in Mexico at the time, turned himself in at the border on outstanding warrants.[2] (Government Disclosure, Bates # 547). The defendant responded that because Gonzalez-Villa was a "deported felon," he would be arrested and would be looking at "five years." (Bates # 549). Seeing an opportunity to enrich himself, however, the defendant proposed an alternative: "[W]hy don't you wait until I am at the port, what do you think about that?" The defendant continued, "Because I was going to tell you, if he wants to go to jail, he will be in jail for five years. And, or he can wait for when I'm there and then well . . . he passes, right." (*Id.*)

The defendant and UP1 exchanged a series of additional messages about meeting in-person to further coordinate the bribery and smuggling scheme. Eventually, the discussion turned to the defendant's payment. On February 9, 2018, the defendant messaged UP1, "I would like to see if it could be six . . . at least to pay for this month's utilities because I'm also behind. Please if you could make it six, thanks. Bye." (Bates # 552). UP1 responded, apparently referring to Gonzalez-Villa, "Okay. Let me see . . . what I can do . . . the thing is that he is very tight!" (*Id.*) The defendant replied reassuringly, "[B]ut it'll be worth it. Okay? Bye." (*Id.*)

---

[1] Consistent with the Presentence Investigation Report (PSR), the government refers to this individual as UP1 for "unidentified person 1."

[2] The messages between the defendant and UP1 were in the form of verbal and written communications over WhatsApp, and were primarily in the Spanish language. The English translation of those messages outlined in this memorandum was done by a court-certified interpreter.

On the morning of February 10, 2018, UP1 messaged the defendant asking "[t]oday . . . ?" (Bates # 553). The defendant responded, "I'll let you know . . . ." (*Id.*) Later that morning, the defendant left his post with his canine, and went to the pedestrian inspection area at the port of entry to relieve another CBP officer. (PSR ¶ 7). Shortly after the defendant took over the pedestrian inspection desk, UP1 and Gonzalez-Villa entered the port of entry, and the defendant waived them to his line. (*Id.*) Surveillance footage indicates the defendant scanned only one identification, but allowed UP1 and Gonzalez-Villa to both enter the United States. (*Id.*)

After successfully smuggling Gonzalez-Villa into the United States, the defendant messaged UP1 stressing the importance of keeping their scheme a secret: "Juan Carlos [Gonzalez-Villa] cannot be saying anything please and thanks because this was a God send because I didn't have to pay the rent or the car, power, etc. Thanks." (Bates # 553). The defendant followed up asking for immediate payment of the bribe, writing, "[C]an you give me the money today better. I have to pay my bills on Monday. Thanks." (*Id.*) Gonzalez-Villa, using UP1's phone, responded enthusiastically, "This is Juan Carlos . . . all good!!! You'll have it in your hands Monday!!! Don't worry!!! Zero nothing happens!!! Thanks motherfucker for the favor!!!" (*Id.*)

Additional messages between the defendant and UP1 on February 12, 2018 documented the exchange of the bribe payment, and reflect that the defendant was ultimately paid $6,000 cash as he requested. Approximately one week later, Gonzalez-Villa was arrested on several outstanding warrants, including a warrant for a felony weapons offense. (PSR ¶ 10).

B. Other Relevant Conduct

The defendant's abuse of his position as a CBP officer in exchange for the $6,000 cash bribe was not an isolated incident. The investigation revealed that the defendant had previously smuggled other illegal aliens—several allegedly involved in drug trafficking—into the United States in return for payment of $4,000 per alien. (Government Disclosure, Memorandum of Activity 7/18/2018). On one occasion, the defendant allegedly became

concerned that one of the aliens he helped sneak into the United States with UP1's assistance was the notorious Joaquin Guzman-Loera aka "El Chapo." (*Id.*) The defendant was told his fears were unfounded, and the defendant and UP1 later joked about the "El Chapo" incident during a recorded conversation in October 2018. (Bates # 187).

During that same October 2018 conversation, the defendant and UP1 made plans for additional criminal activity. The discussion centered on using the defendant's official position as a CBP officer to facilitate the importation of illegal narcotics into the United States in exchange for a bribe. When UP1 initially broached the subject, the defendant indicated that the smuggling would involve "bodies," but UP1 clarified that they would do "no more of that" and that instead they would be smuggling illegal drugs—possibly "Crystal, meth, [or] heroin." (Bates # 168-69).

The defendant and UP1 discussed various ways to avoid detection for the load vehicle, including having the defendant direct the vehicle to secondary inspection in order to avoid an X-ray scan by other law-abiding CBP officers. They also discussed the bribe that would be paid to the defendant in exchange for allowing the drugs to be imported. For example, at one point in the conversation, the defendant stated, "What matters to me, not what it's bringing [sic] or as long as they are making me my bit of money." (Bates # 209). The defendant added that he hoped it wasn't marijuana because marijuana was "really smelly." (*Id.*) UP1 responded that he/she thought his/her supplier was pushing "meth," "pills," or "Crystal." (*Id.*) After discussing how much the drugs were worth, the defendant stated, "As long as they give you about twenty [thousand] and about twenty [thousand] to me." (Bates # 210). UP1 and the defendant discussed specific dates for executing the scheme, and the defendant suggested the following Monday because he had to "pay rent." (Bates # 198).

The drug-smuggling incident did not materialize as planned, and the defendant was arrested on October 24, 2018. (PSR ¶ 17). When confronted by the FBI and DHS-OIG about whether he knew Gonzalez-Villa, the defendant lied and said he did not. (*Id.*) The defendant also lied about accepting money to cross people into the United States illegally.

(*Id.*) Following his arrest, the defendant contacted UP1 in order to coordinate their stories and to get UP1 to lie about the purpose of the $6,000 payment. (PSR ¶¶ 18-19).

## LEGAL ANALYSIS

The parties' plea agreement provides for a sentencing range of 0 to 36 months of imprisonment. The Sentencing Guideline range outlined in the PSR is 24 to 30 months, and the Probation Office recommends a sentence of 24 months and a $10,000 fine. For the reasons described below, the United States believes that a sentence at the top of the guideline range—30 months of imprisonment—is warranted under the factors outlined in 18 U.S.C. § 3553(a).

A. <u>The Nature, Circumstances, and Seriousness of the Offense</u>

At its core, this is a case about corruption. The only reason the defendant was able to smuggle aliens into the United States successfully and undetected was because he held a trusted position in federal law enforcement protecting the border—a position of trust he abused in order to line his own pockets. "[P]ublic corruption and the abuse of positions of trust for personal gain undermine the public's faith in our system of government." *United States v. Thorpe*, No. 17-CR-40062-SMY, 2018 WL 5322352, at *5 (S.D. Ill. Oct. 29, 2018). And "[c]riminal conduct by a law enforcement agent that is facilitated by the agent's unique position of public trust is especially serious." *Garnica*, 471 F. App'x at 370. For these reasons alone, and given the defendant's position as a federal law enforcement officer, a substantial term of imprisonment should be imposed.

Further, multiple aggravating factors unique to the defendant's corrupt activities in this case militate in favor of a sentence at the top of the guideline range. First, the defendant proposed smuggling Gonzalez-Villa into the United States knowing that Gonzalez-Villa was a convicted felon with outstanding warrants. For good reason, the law contemplates enhanced penalties for smuggling illegal aliens who were convicted of certain offenses. *See, e.g.*, U.S.S.G. 2L1.1(a)(2) (providing for a base offense level of 23 rather than 12 for a conviction under 8 U.S.C. § 1327 for smuggling an alien previously deported for an aggravated felony). While the defendant was not charged with 8 U.S.C. § 1327, and it is

unclear whether Gonzalez-Villa's prior convictions technically qualify as "aggravated felonies," the defendant's express knowledge of Gonzalez-Villa's felony status and outstanding warrants enhance the level of corruption in this case.

Second, the relevant conduct demonstrates a particularly reckless disregard for who and what the defendant was willing to smuggle into the United States in exchange for bribes. As described above, the defendant allegedly helped several drug traffickers enter the United States illegally, and at one point believed he had actually smuggled "El Chapo," the former leader of the Sinaloa drug cartel. The defendant's recklessness is also reflected in the October 2018 meeting with UP1, where the defendant indicated he did not care what they were bringing into the United States, so long as he got paid.

Third, the defendant took steps to cover up his criminal scheme and otherwise obstruct the investigation. When first confronted by the FBI and DHS-OIG about his smuggling activities, the defendant lied and disavowed any knowledge of Gonzalez-Villa. Worse, following his arrest and release from custody, the defendant attempted to get UP1 to line up their stories and lie about the true purpose of the $6,000 bribe. As outlined in the PSR, the defendant even indicated that he would lie in court to save himself. (PSR ¶ 19).

Finally, when looking to the harm caused by an act of corruption, the government recommends that one factor the Court should consider heavily is whether the conduct violated a central responsibility of the official position held by the defendant. A CBP officer is primarily charged with securing the border against individuals who are not permitted within the United States, and stemming the flow of contraband that can cause harm to our communities. These officers are permitted to use force, even lethal force, to accomplish those important goals. The defendant was willing to sabotage these core responsibilities for a few thousand dollars.

Taken together, these aggravating factors paint a picture much worse than the run-of-the-mill corruption case—serious as even the standard corruption case may be. To reflect the heightened corruption inherent in the nature, circumstances, and seriousness of

the defendant's offense conduct, a sentence at the top of the guideline range is warranted.

B. <u>Promoting Respecting for the Law and Providing Just Punishment</u>

When the rule of law is undermined by the very people sworn to uphold it, respect for the law is severely diminished. Consequently, "[i]t must be made plain to the public at large that [corruption] is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government. When a corrupt office holder receives too lenient a sentence, the public understandably loses confidence in the integrity of its system of government." *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa) (imposing a sentence on an elected official for selling political influence and the "proactive concealment of the transactions from the public and from regulators").

In addition, while not specifically contemplated by Section 3553(a), the United States would also urge the Court to consider how its sentence can help promote respect for the law enforcement community tarnished by the defendant's conduct. Nobody is more appalled at corruption within the ranks of CBP than the honest and hardworking CBP officer who performs his or her duties with integrity and without fanfare. The Court's sentence should take into account the disrepute the defendant's conduct may have caused to CBP and the hardworking men and woman who defend our border every day.

In this case, a sentence at the top of the guideline range would help restore respect for the law, demonstrate to the public that corruption is not tolerated, and provide a just punishment for the offense.

C. <u>Promoting Deterrence</u>

"Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes." *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015). Indeed, "[w]hite collar criminals may be particularly susceptible to general deterrence because defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (internal citation omitted).

News of the Court's sentence in this case will likely spread quickly within the CBP

and Border Patrol communities in Southern Arizona, including to the few agents and officers calculating the risks and benefits of selling their position to criminal organizations in Mexico. A sentence at the top of the guideline range would send a strong message that the risk of a substantial prison sentence far outweighs the financial benefits of corruption, and would therefore go a long way toward promoting general deterrence.

**CONCLUSION**

For the foregoing reasons, the United States recommends that the Court impose a sentence of 30 months of imprisonment, a $6,000 fine, and 3 years of supervised release.

Respectfully submitted this 6th day of January 2021.

> MICHAEL BAILEY
> United States Attorney
> District of Arizona
>
> *s/ Ryan J. Ellersick*
>
> RYAN J. ELLERSICK
> GORDON E. DAVENPORT, III
> Assistant U.S. Attorneys

Copy of the foregoing served electronically or by
other means this 6th day of January 2021, to:
Joshua Hamilton, Esq.